**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
------------------------------- x
                                :
SHAUL MARSHALL PRAVER,          :
                                :  Civil No. 3:22-cv-01616(AWT)
         Plaintiff,             :
                                :
v.                              :
                                :
STATE OF CONNECTICUT DEPARTMENT :
OF CORRECTION, ET AL.           :
                                :
         Defendant.             :
------------------------------- x
```

## RULING ON DEFENDANTS' MOTION TO DISMISS

The pro se plaintiff, Shaul Marshall Praver, brings this action against his former employer, State of Connecticut Department of Correction ("DOC"), and ten individual defendants, asserting claims for religious discrimination and retaliation in violation of state and federal law. The plaintiff filed the complaint on December 19, 2022 and subsequently filed a "Definitive Statement" on April 12, 2023 in response to a motion for a more definite statement filed by defendants DOC and Angel Quiros. The plaintiff's claims are as follows: Count One, hostile work environment in violation of Title VII; Count Two, religious discrimination in violation of Title VII; Count Three, retaliation in violation of Title VII; Count Four, discrimination in violation of 42 U.S.C. § 1983; Count Five, retaliation in violation of 42 U.S.C. § 1983; Count Six, a claim

pursuant to 42 U.S.C. § 1985; Count Seven, religious discrimination in violation of the Connecticut Fair Employment Practices Act ("CFEPA") Conn. Gen. Stat. § 46a-60 et seq..[1] The plaintiff does not specify which counts are brought against which defendants.

The defendants have moved to dismiss the plaintiff's Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(5), and 12(b)(6).

For the reasons set forth below, the defendants' motion to dismiss is being denied in part and granted in part.

## I. FACTUAL ALLEGATIONS

The Complaint, "which [the court] must accept as true for purposes of testing its sufficiency," alleges the following circumstances. Monsky v. Moraghan, 127 F.3d 243, 244 (2d Cir. 1997).[2]

Plaintiff Rabbai Shaul Marshall Praver was employed by the DOC as a Chaplain Rabbi from October 2013 to April 2022. In his role as a Chaplain Rabbi, "Plaintiff alternated [] ministry

---

[1] The plaintiff, proceeding pro se, does not number or specify these counts. The above characterization is the court's interpretation of the plaintiff's allegations in his pleadings. See also Defs.' Mem. in Supp. of Mot. to Dismiss (ECF No. 24-1) at 3.
[2] The court is treating the plaintiff's Definitive Statement (ECF No. 18) and Time Line (ECF No. 29) as part of the Complaint.

services between six of [the DOC's] locations each week." Compl.
(ECF No. 1) ¶ 9.[3]

Starting in 2017, the plaintiff was subjected to
"Defendants' antisemitic and discriminatory verbal, written,
administrative and threatening physical assaults." Compl. ¶ 8.
The plaintiff first complained regarding the mistreatment on
October 4, 2019 by means of a "letter to respondent saying that
respondent was harassing [him] on the basis of his Jewish
identity." Time Line (ECF No. 29) at 1. At the time of the
letter, "Director Williams was demanding that Rabbi Praver and
Rabbi Ostrozynski cover all 16 correctional facilities for all 8
nights of Hanukah themselves together with whatever volunteers
they could enroll." Time Line at 1. The next month, November
2019, the plaintiff "set a meeting with 1199 Union to discuss
concerns of inequity with Nat Roosa, a Union official," and
"wrote to Respondent's boss, Director Murphy seeking protection
and redress . . . ." Time Line at 1. Until his retirement,
Director Murphy "attempted to protect Rabbi[] Praver from
Director Williams harassment [and] also intervened when Director
Williams attempted to stuff Rabbi Praver's file with violations
on false pretenses." Time Line at 1.

---

[3] The page numbers cited to in this ruling for documents that have been
electronically filed refer to the page numbers in the header of the documents
and not to the page numbers in the original documents, if any.

On December 17, 2019, in response to the plaintiff
implementing only 96 of the "128+ candle light ceremonies,"
Director Williams "verbally assaulted Plaintiff disparaging him
as a 'Worthless Jew who didn't care about Judaism.'" Definitive
Statement (ECF No. 18) at 4-5. Further,

> "[w]hen Plaintiff advised [Director Williams] that his
> remarks were antisemitic and deeply offensive,
> [Director Williams] said 'I'm not an antisemite, you
> just decided to call me names[]' [and] persisted
> justifying his behavior exclaiming, '[i]f you cared
> about Judaism, you would have made sure that every
> facility had candle lighting ceremonies all eight
> nights of Chanukah. You are a worthless Jew who
> doesn't even care about his own religion.'"

Definitive Statement at 5. "That is the day that complainant's
formal effort to seek help and redress began with other state
venues outside the agency of religious services of the DOC."
Time Line at 1.

On October 8, 2020, after formal efforts, including
reaching out to Director Williams's supervisors did not provide
"lasting relief," "Plaintiff submitted a formal complaint of
antisemitism and a hostile work environment with the Connecticut
Commission on Human Rights and Opportunities [("CHRO") and] also
registered his complaint with the 1199 Union." Definitive
Statement at 5. The CHRO ordered mandatory mediation "which
failed." Definitive Statement at 5.

The plaintiff states that "[r]espondents both individually
and jointly have committed . . .acts of harassment and

retaliation against me because I am Jewish, and I previously filed a formal complaint against[DOC] for the same illegal behavior." Compl. ¶ 13. The plaintiff also states that, following the failed mediation:

> Defendant then launched a campaign of retaliation against Plaintiff throughout the state, and Defendant enrolled several of his trusted allies and subordinates to act as accessories to his crimes. First Defendant attempted to get Plaintiff fired but Plaintiff was a strong employee with excellent documented work history and was well liked by Commissioner Cook. Defendant shifted his efforts to forcing Plaintiff to resign. Towards this effort Defendant implemented a long and lamentable string of hostile retaliatory acts against Plaintiff. . . .

Definitive Statement at 6. The plaintiff alleges that the following instances of harassment and retaliation occurred after his initial complaint was filed with the CHRO.

On November 4, 2020, the plaintiff's "CPE studies were ruled to be an 'unapproved DOC program' that complainant must do on his own time." Time Line 1. "Concurrently, all other chaplains in the department who were enrolled in the same course of study were approved to attend CPE classes on work time . . . because it was ruled to be an approved DOC program." Time Line at 1.

On February 8, 2021 Director Williams sent out a directive limiting Passover services to individual worship and silent prayer instead of collective services.

On March 26, 2021, the plaintiff's primary payroll facility was permanently transferred "from Bridgeport Correctional Center [("BCC")], where Plaintiff had been located since 2013, to Cheshire Correctional Institute [("CCI")]." Time Line at 1; Compl. ¶ 10. While the plaintiff's primary payroll facility was first changed from BCC to CCI in April 2020, "[t]he arrangement was promised to be temporary due to Covid-19." Compl. ¶¶ 10-11. At CCI, the plaintiff was under the supervision of Deacon Jose Robles who ". . . had been aiding and abetting Respondent Rev. Williams in hostile and discriminatory actions including those that were antisemitic." Compl. ¶ 11. The plaintiff "repeatedly requested that he be moved back to BCC where there [was] a professional environment under Associate Chaplain Dr. Rev. Christie . . . but Director Williams w[ould] not cooperate." Time Line at 1. The plaintiff contends that "Defendant Williams gave me a direct order to work under Defendant Robles with the intention of harassing and tormenting me . . . That is why Defendant Williams insists on keeping me under Defendant Deacon Robles' supervision."[4] Compl. ¶ 11.

During this time the defendants also made the plaintiff's use of a state vehicle, which he had been given to travel between facilities, "impractical" by requiring that the vehicle

---

[4] While the plaintiff occasionally refers to Jose Robles as "Defendant Robles" in his pleadings, Robles has not been named as a defendant in this case.

be kept at CCI instead of "at BCC where it had been kept prior to pandemic."[5]  Compl. ¶ 13-b; Time Line at 1. While BCC was only ten minutes from the plaintiff's home, CCI was one hour away and "not on the way to . . .  other facilities on the 195 Interstate corridor." Compl. ¶ 13-a. Consequently, the plaintiff used his personal vehicle to go between facilities as use of the state vehicle "would add many unnecessary hours on the road." Compl. ¶ 13-b. However, the DOC "refuse[d] to pay [the plaintiff] the standard reimbursements for the use of [his] personal vehicle." Compl. ¶ 13-b.

From the period of July 21, 2021 to November 2021 Director Williams "harassed" the plaintiff by first denying, then approving, then subsequently rescinding his approval of the plaintiff's application to start a program at the York Correctional Institute ("YCI") called "Gates of Understanding." Compl. ¶ 13-c.  Director "Williams' pattern of approving and rescinding his approval, [did] not comport with a normal process" and "no other denominational chaplains running programs experienced the same treatment." Compl.  ¶ 13-c. The plaintiff's program was eventually approved by "Defendant Garcia, two chains of command above Rev. Williams." Compl. ¶ 13-c. "However,

---

[5] The plaintiff concedes his "records are not entirely clear" as to when Director Williams ordered him to move his van to CCI.  Opp'n to Defs' Mot. to Dismiss (ECF No. 26) at 4 n.2; see also Compl. ¶ 13-a (stating it occurred on "May 23, 2021"); Time Line at 1 (discussing infeasibility of using the van under the heading of "March 26, 2021").

Defendants later disrupted that program by transferring the majority of the students to other facilities." Compl.  ¶ 13-b. In addition, "Director Williams advised [Deputy] Snyder on 11/21/21 that Gates of Understanding should not continue even though it was already in progress . . .  [and] crudely disparaged Rabbi Praver and his program." Time Line at 4. Deputy Snyder later "signaled back" in an email to the plaintiff that his "program will continue uninterrupted." Time Line at 4.

On or around July 29, 2021, defendant Michael Lathrop, a corrections officer at YCI, "refused to send a Jewish inmate to [the plaintiff's] weekly Jewish service." [6]  Compl. ¶ 13-f; Time Line at 2. Earlier that day, the plaintiff had reported defendant Lathrop for perpetrating an act of violence against female inmates in his care.

On "August 2, 2021," while the plaintiff was "on a pre-approved family sick day," "[CCI] officers Reported to the inmates that there would be no Jewish services because [the plaintiff] had died." Compl. ¶ 13-h; Time Line at 2. The plaintiff "initially became aware of this rumor from the inmates in [his] group the following week, Monday, August 9, 2021."

---

[6] The Complaint appears to incorrectly state that this conduct occurred on August 2. See Compl. ¶ 13-e. The court assumes that the conduct occurred on or around July 29 as the plaintiff's pleadings state that he was on "a sick family day [SFAM] on August 2, 2021," Compl. ¶13-h, and that on "July 29, 2021: Complainant reported acts of violence by officer Lanthrop against York inmates" and later references the event as the "July 29th incident," Time Line at 2.

Compl. ¶ 13-h. "Defendant Robles, [the plaintiff's] direct supervisor, did not correct the record for the inmates" although he "admitted to knowing about it" and was the one who approved the plaintiff's absence that day. Compl. ¶¶ 13-h-i. Robles "further harassed" the plaintiff after he complained about the incident and conditioned having a "discussion about the incident on [the plaintiff] agreeing not to file an incident report in the facility." Compl. ¶ 13-i. During that discussion, Robles chastised the plaintiff "for voicing [his] concerns," "stated that the incident was not serious," "reprimanded [him] for complaining about it in the first place," and "asked [the plaintiff] who [he] thought would be believed, the inmates or the staff." Compl. ¶ 13-i. The plaintiff states that the "incident was one more planned antisemitic assault against me. The intention was to intimidate me and induce me to resign." Compl. ¶ 13-h.

"On or about August 4, 2021, and continuing thereafter, Defendant Rev. Williams began harassing and retaliating against [the plaintiff] . . ." for "advocating for Jewish inmates through what [the plaintiff] write[s] in e-mails to him, the lawyers, and the kitchen supervisors." Compl. ¶ 13-g. This arose from a July 2021 meeting between the plaintiff and Director Williams regarding "four observant Jewish inmates who maintain kosher standards beyond what the facilities can . . .

accommodate." Compl. ¶ 13-g. During the meeting they "discussed allowing these inmates to purchase their own kosher food just like other inmates purchase non-kosher food on commissary." Compl. ¶ 13-g. After the meeting, Director Williams "agreed [they] should . . . push this solution forward" and told the plaintiff "I don't care if you provide them with the order forms, let's get this thing done." Compl. ¶ 13-k. "When Rev. Williams said in an e-mail to the legal department and kitchen supervisors that [they] never discussed [the solution of kosher inmates purchasing their own kosher food], and he would not implement it," the plaintiff sent a copy of his notes from their "five hour meeting" and asked ". . . how are we not violating their first amendment rights to practice their faith under RLUIPA?" Compl. ¶ 13-g. Director "Williams characterized [the] question as advocating for the inmates which was then equated with the serious charge of [undue] familiarity." Compl. ¶ 13-g. The plaintiff states that the July meeting "was one big, convoluted way of getting me to give inmates order forms which Director Williams would then use as a weapon to try and get me fired. But I didn't give the inmates order forms."

"On August 18, 2021, Defendants Williams and Robles harassed" the plaintiff by denying his request to be provided "with an alternative work schedule for the month of September 2021." Compl. ¶ 13-j. "Defendant Williams granted the same

request for a similarly situated colleague on the same days."
Compl. ¶ 13-j.

"On August 30, 2021," Director Williams required the
plaintiff to attend a "mandatory counseling session . . .
regarding being more careful about what [he] wrote in e-mails."
Time Line at 2. During this meeting, the plaintiff was "further
counseled for questioning if it was legal for the department not
to provide and not allow observant Jewish inmates to purchase
Kosher food." Compl.  ¶ 13-k.

"On September 2, 2021," the plaintiff's Rosh Hashana
services at YCI were "repeatedly interrupted" by officers
"Gunnar Weglarz and Mackenzie Whitlock." Time Line at 2; Compl.
¶13-l. Once services concluded, Captain Ivette Diaz and Captain
Paul Senita entered the room and accused the plaintiff of
"interfering with the count" and "speaking unprofessionally to
one of their officers." Compl.  ¶13-m. Captain Diaz told the
plaintiff they were referring to him reporting Officer Lathrop's
violent conduct on July 29, 2021. Compl. ¶ 13-m; Time Line at 2.
At the time, Captain Diaz was assigned to investigate Officer
Lathrop's violent conduct. Time Line at 2. The plaintiff "did
not feel safe at Y[CI] at that point," Time Line at 2, and was
later "barred from the facility by the Deputy Warden Iozzia for
[his] own physical safety . . . because [of] additional

retaliation and violent threats made against [him] by Defendants Captains Ivette Diaz and Paul Senita," Compl. ¶13-f.

On September 20, 2021, Robles initially denied the plaintiff's request to bring in specific ritual items, including a "Lulav Palm Branch," necessary to conduct Sukkot services for inmates at CCI. Compl. ¶13-n. At the time he denied the plaintiff's request, Robles had previously approved Palm Branches for Catholic services to be brought into the facility and had authorized "an observant Jewish inmate at [CCI] to purchase the same Lulav Palm Branch" that the plaintiff was seeking to bring in. Compl. ¶13-n.

On October 4, 2021, "and continuing thereafter," Director Williams harassed the plaintiff "concerning a failed kitchen inspection" at CCI, which Director Williams had instructed the plaintiff to perform. Compl. ¶13-o. In an email exchange on October 7, 2021, Director Williams stated "I need written records" in response to the plaintiff's request to speak on the phone about the failed inspection. Time Line at 3. Although the plaintiff was "being careful about what he put into emails," on October 18, 2021 "Defendant Williams again harassed and publicly chastised" the plaintiff, stating in email that "[t]his repeated behavior of advocating for inmates in email has to stop. You have been advised of this several times now." Compl. ¶ 13-p; Time Line at 3.

On October 20, 2021, the plaintiff's request to work from home to accommodate his "Board Certified Chaplain interview, the final step of his CPE studies," was denied "on the basis that his certification interview was an unapproved DOC program." Time Line at 3.  "At the same time, all other chaplains enrolled in CPE studies were authorized to do their CPE studies on work time, at home via zoom." Time Line at 3.

On November 16, 2021, "Director Williams sent out a statewide Memo," Time Line at 4, "mandating . . . that the observance of Hanukah would be limited to individual worship and silent prayer." Compl.  ¶ 13-q. At the time, "every other denomination [was] permitted to have collective services in a normal out loud manner." Time Line at 4.

The plaintiff's pleadings allege additional retaliatory acts by the "defendant" on unspecified dates, including:

> Prohibiting Plaintiff from sharing his spiritual writings . . . .Allowing Nazi propaganda to be loaded onto the tablets that every inmate was issued. . . Williams Blaming Plaintiff for a suicide attempt by a psychotic inmate and defaming plaintiff by disseminating same perfidious narrative among staff . . . [and] Williams defaming the Jewish Chaplains in a public document wherein Defendant knowingly and falsely advised that the Departments' Jewish Chaplains receive the most amount of overtime pay than any other denominational chaplain. Public documents show the opposite to be true.

Definitive Statement at 6-7.

On February 18, 2022, the plaintiff filed a second complaint with the CHRO "regarding retaliation for filing the first complaint." Compl.    ¶ 12. "Once again []CHRO ordered mandatory mediation." Definitive Statement at 7.

A "few days" before April 25, 2022 "[w]hen Defendant's threats of physical violence failed to convince Plaintiff to resign, Defendant attempted to carry out actual violence against Plaintiff" when "custody employees at [CCI] forced him on two occasions that day to take detours throughout the building that required him to pass through large groups of unsupervised inmates." Definitive Statement at 7, 9. "On the first occasion a . . . correctional officer . . . seeing the scene on the video screen, ran upstairs to intervene." Definitive Statement at 9. "On the second occasion. . . plaintiff entered the elevator . . . and waited there until he could hear that the hallway of unsupervised inmates had cleared." Definitive Statement at 9. These detours "were severely in violation of the well-defined security protocols of the department." Definitive Statement at 9. "After Defendant[] demonstrated his willingness to use inmate agents to physically attack Plaintiff, Defendant succeeded in constructively terminating Plaintiff's employment . . . and [the plaintiff] formally submitted his notice of resignation on April 25, 2022." Definitive Statement at 7. The mediation ordered by

CHRO, which failed, did not occur until after the plaintiff terminated his employment.

Following the second failed mediation, the plaintiff requested a release of jurisdiction for both of his CHRO complaints, which was granted.  The plaintiff brought the instant action on December 19, 2022.

## II. LEGAL STANDARD

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 550, 555 (2007) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all

the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (internal citations and quotations omitted). However, the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." Id. at 547. "A claim has facial plausibility when the [claimant] pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "The function of a motion to dismiss is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" Mytych v. May Dep't Store Co., 34 F. Supp. 2d 130, 131 (D. Conn. 1999) (quoting Ryder Energy Distribution v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984)). "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his claims." United States v. Yale New Haven Hosp., 727 F. Supp. 784, 786 (D. Conn. 1990) (citing Scheuer, 416 U.S. at 232).

In its review of a motion to dismiss for failure to state a claim, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." Samuels v. Air Transport Local 504, 992 F.2d 12, 15 (2d Cir. 1993). "[I]n some cases, a document not expressly

incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss. A document is integral to the complaint 'where the complaint relies heavily upon its terms and effect.'" Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).

When interpreting the allegations in a pro se complaint, the court applies "less stringent standards than [those applied to] formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972); see also Branham v. Meachum, 77 F.3d 626, 628-29 (2d Cir. 1996). Furthermore, the court should interpret the plaintiff's complaint "to raise the strongest arguments [it] suggest[s]." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). Consistent with the liberal reading of a pro se plaintiff's complaint, "[a] district court deciding a motion to dismiss may consider factual allegations made by a pro se party in his papers opposing the motion." Walker v. Schult, 717 F.3d 119, 122 n.1 (2d Cir. 2013).

## III. DISCUSSION

### A. Counts One, Two, and Four through Seven; Individual Defendants

With respect to Count One, defendant DOC does "not contest that Plaintiff has sufficiently alleged a Title VII claim based

-17-

on a hostile work environment." MTD Doc 24 at 3.

With respect to Counts Four and Seven and the individual defendants, the plaintiff states that he "does not oppose the Motion to Dismiss insofar as it seeks to dismiss his Section 1983 employment discrimination claims, his claims under the Connecticut Fair Employment Practices Act, and his claims against individual Defendants." Opp'n to Defs' Mot. to Dismiss at 5. Thus, the motion to dismiss is being granted as to Counts Four and Seven and with respect to the individual defendants.

While the plaintiff has not explicitly conceded with respect to the claims in Count Two (discrimination in violation of Title VII), Count Five (retaliation in violation of 42 U.S.C. § 1983), and Count Six (a claim pursuant to 42 U.S.C. § 1985), he has not responded to the arguments for their dismissal made by the defendants; he does not even mention these claims in his opposition. Therefore, the court finds that these claims have been abandoned by the plaintiff and grants the motion to dismiss with respect to these counts. See e.g., Leal, Inc. v. Twin City Fire Ins. Co., 573 F. Supp. 3d 648, 660-661 (D. Conn. 2021) ("A court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.") (internal quotation marks and citations omitted).

**B. <u>Title VII Retaliation Claim Against Defendant DOC</u>**

Title VII's anti-retaliation provision makes it unlawful "for an employer to discriminate against any of [its] employees . . . . because he has opposed any practice made an unlawful employment practice by [Title VII] . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C.S. § 2000e-3(a). To establish a prima facie case with respect to a retaliation claim under Title VII, a plaintiff must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." <u>Littlejohn v. City of New York</u>, 795 F.3d 297, 315-316 (2d Cir. 2015) (internal quotation marks and citation omitted). In other words, "for a retaliation claim to survive . . . a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated 'or took an adverse employment action' against him, (2) 'because' he has opposed any unlawful employment practice." <u>Vega v. Hempstead Union Free Sch. Dist.</u>, 801 F.3d 72, 90 (2d Cir. 2015) (quoting 42 U.S.C.S. § 2000e-3(a)). The burden on the plaintiff at this initial stage is "de

minimis." See Duplan v. City of New York, 888 F.3d 612, 626 (2d Cir. 2018).

The defendants make three challenges with respect to the plaintiff's Title VII retaliation claim against defendant DOC. They contend that the plaintiff's pleadings lack factual allegations showing that the plaintiff engaged in protected activity other than filing the CHRO complaints. See Defs.' Reply Mem. in Supp. of their Mot. to Dismiss (ECF No. 27) at 6. The defendants also argue that the plaintiff's retaliation claims based on the adverse actions of transfer and constructive discharge should be dismissed because the plaintiff failed to administratively exhaust them. See Defs.' Mem. in Supp. of Mot. to Dismiss (ECF No. 24-1) at 26-27. Finally, they contend that the plaintiff "fails to sufficiently allege causation."  Defs.' Reply Mem. in Supp. of their Mot. to Dismiss at 7.

### 1. Protected Activity

A protected activity is "action taken to protest or oppose statutorily prohibited discrimination." Siuzdak v. Sessions, 295 F. Supp. 3d 77, 96 (D. Conn. 2018) (quoting Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000)). This includes "the filing of formal charges of discrimination as well as . . . making . . . informal protests of discrimination, including making complaints to management . . . ." Matima v. Celli, 228 F.3d 68, 78-79 (2d Cir. 2000) (internal quotation marks and

citation omitted). Although a complaint may be informal, it may not be so vague or "generalized" that the plaintiff's employer "could not reasonably have understood that [the plaintiff] was complaining of conduct prohibited by Title VII." Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 108 (2d Cir. 2011) (internal quotation marks and citation omitted); see also Miller v. Edward Jones & Co., 355 F. Supp. 2d 629, 643 (D. Conn. 2005) ("[C]omplaints that are vague and ambiguous and do not sufficiently articulate the nature of the harassment do not constitute a protected activity."). While "the plaintiff need not establish that the conduct he opposed was in fact a violation of Title VII . . . [he] must demonstrate a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Manoharan v. Columbia University College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988) (internal quotation marks and citations omitted). Finally, in addition to showing participation in a protected activity, plaintiffs claiming retaliation must also show that the defendant knew of the protected activity in order to establish first two elements of a prima facie retaliation case. See e.g., Littlejohn, 795 F.3d at 315-316.

The plaintiff states he "complained about discrimination and retaliation on numerous occasions, both internally to supervisors at DOC (on or about Dec. 17, 2019, Dec. 18, 2019,

August 2021, November 23, 2021, and Dec. 13, 2021) and externally to the CHRO (on or about October 8, 2020 and February 18, 2022)." Opp'n to Defs' Mot. to Dismiss (ECF No. 26) at 4. The defendants concede that the filing of the "October 2020 and February 2022 CHRO/EEOC complaints" constitute protected activity, Defs.' Reply Mem. in Supp. of their Mot. to Dismiss at 6, and that the plaintiff's employer, defendant DOC, was aware of this protected activity, see Aff. of Tracie C. Brown, Esq. (ECF No. 24-2) at ¶¶ 4-5. However, defendants contend that "Plaintiff has not otherwise demonstrated that he engaged in any other protected activities nor has Plaintiff demonstrated the management was aware of his alleged protected activities other than the CHRO complaints." Defs.' Reply Mem. in Supp. of their Mot. to Dismiss at 6. The court agrees.

As to December 17 and 18, 2019, although the pleadings indicate the plaintiff took measures to address the comments made by Director Williams' on December 17, the information provided is insufficient to establish that these actions qualify as protected activity. See Time Line at 1 ("That is the day that complainant's formal effort to seek help and redress began with other state venues outside the agency of religious services of the DOC. [Union] 1199 was informed of the incident."); Definitive Statement at 5("Plaintiff reached out to Defendant's superiors"). For example, the plaintiff does not identify which

"other state venues" he used, nor does he provide information indicating that he stated that Director Williams's comments constituted discrimination in violation of Title VII. Nor does the plaintiff allege facts suggesting that his actions around December 17 and 18 put his employer, defendant DOC, on notice that he believed that discrimination had occurred in violation of Title VII. Thus, these actions are not protected activities for the purposes of retaliation under Title VII.

For similar reasons, the plaintiff's pleadings do not support a conclusion that he engaged in protected activities on "August 2021, November 23, 2021, and Dec. 13, 2021." As to "August 2021," the only complaint to DOC supervisors mentioned in the pleadings is the plaintiff's discussion with Robles concerning the rumor about the plaintiff's death. See Comp. ¶ 13-h,i. While the plaintiff states in the Complaint that the "incident was one more planned antisemitic assault against me," he does not contend or otherwise offer facts indicating that this belief was communicated to Robles or any other supervisor at DOC. Compl. ¶ 13-h. Likewise, the plaintiff makes only a passing reference in his pleadings to conferences he had with defendant Quiros and Elulia Garcia on "November 23, 2021, and Dec. 13, 2021." See id. ¶ 13-b ("Notwithstanding my conference with Commissioner Quiros on November 23, 2021, and Respondent DA Garcia on December 13, 2021, the location of the state vehicle

and my primary facility are still [C]CI."). As a result, even when the plaintiff's pleadings are viewed in the most favorable light, they do not include facts sufficient to plausibly allege participation in protected activity on these dates.

Consequently, with respect to protected activity, the plaintiff's retaliation claim is based solely on the complaints filed by the plaintiff with CHRO.

### 2. Adverse Employment Actions

An "adverse employment action" for purposes of a Title VII retaliation claim "is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Vega, 801 F.3d at 90 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006). "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination." Id. Although "petty slights or minor annoyances that often take place at work" are not sufficient, Burlington, 548 U.S. at 68, "alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently substantial in gross as to be actionable," Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010) (internal quotation marks and citation omitted).

In his pleadings, the plaintiff alleges several retaliatory incidents, and in his opposition, he identifies four of these

retaliatory incidents as adverse employment actions: (1) "constructive discharge"; (2) "permanent relocation [of his payroll facility] to C[CI]"; (3) "loss of vehicle access [and] Defendant's refusal to reimburse Plaintiff for mileage"; and (4) "Defendant's diminishment of Plaintiff's job responsibilities" by preventing the plaintiff from implementing the "Gates of Understanding" educational program. Opp'n to Defs' Mot. to Dismiss at 2-4.

The defendants do not advance any substantive argument that these four claimed retaliatory acts do not constitute adverse employment actions for the purpose of the plaintiff's Title VII retaliation claim. The defendants merely argue that claims based on the retaliatory acts of "transfer and constructive discharge should be dismissed since the Plaintiff has failed to administratively exhaust them by filing it with the EEOC." Defs.' Mem. in Supp. of Mot. to Dismiss at 27; see also Defs.' Reply Mem. in Supp. of their Mot. to Dismiss at 2-4. At this stage of the case, the court is not persuaded.

Although "exhaustion is ordinarily an essential element of a Title VII claim," Williams v. N.Y. City Hous. Auth., 458 F.3d 67, 70 (2d Cir. 2006) (internal quotation marks and citation omitted), "claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency,"

<u>Legnani v. Alitalia Linee Aeree Italiane, S.P.A.</u>, 274 F.3d 683, 686 (2d Cir. 2001) (emphasis added) (internal quotation marks and citation omitted). One type of 'reasonably related' claim is a "claim alleging retaliation by an employer against an employee for filing a discrimination charge." <u>Id.</u> Indeed, "retaliation [which] occurs while the EEOC charge is still pending before the agency" is the "paradigmatic case for which the 'reasonably related' doctrine was adopted." <u>Duplan</u>, 888 F.3d at 622.

Here, the plaintiff filed his first complaint with the CHRO on October 8, 2020. The plaintiff states that his primary payroll facility was permanently transferred to CCI on March 26, 2021, <u>see</u> Time Line at 1, and he was constructively discharged on April 25, 2022, <u>see</u> Definitive Statement at 7. The plaintiff also claims that both actions were carried out in retaliation for him filing the first CHRO complaint. <u>See</u> Compl. ¶ 13 ("The Respondents . . . committed the following acts of harassment and retaliation against me because . . . I previously filed a formal complaint against Defendant [DOC] for the same illegal behavior"); Definitive Statement at 6 ("Defendant then launched a campaign of retaliation against Plaintiff throughout the state . . . First Defendant attempted to get Plaintiff fired . . . [then] shifted his efforts to forcing Plaintiff resign."). Finally, the pleadings suggest that the plaintiff only filed for a release of jurisdiction with respect to his first CHRO

complaint after he was constructively discharged. See Definitive
Statement at 7. Thus, the plaintiff has alleged facts showing
that the retaliatory acts of transfer and constructive discharge
took place over the course of the CHRO's investigation into, and
as a result of, his discrimination complaint.

### 3. Causal Connection

To adequately plead causation, "the plaintiff must
plausibly allege that the retaliation was a 'but-for' cause of
the employer's adverse action." Vega, 801 F.3d at 90. "'[B]ut-
for' causation does not . . . require proof that retaliation was
the only cause of the employer's action, but only that the
adverse action would not have occurred in the absence of the
retaliatory motive." Id. at 90-91 (alteration in original)
(internal quotation marks and citation omitted). This "may be
shown by direct evidence of retaliatory animus or inferred
through temporal proximity to the protected activity." Duplan,
888 F.3d at 625 (citing Id.); see also Littlejohn, 795 F.3d at
319 ("A causal connection in retaliation claims can be shown
either '(1) indirectly, by showing that the protected activity
was followed closely by discriminatory treatment, . . . or (2)
directly, through evidence of retaliatory animus directed
against the plaintiff by the defendant.'") (quoting Gordon v.
N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)). Even
where temporal gaps between the protected activity and the

adverse actions are too great to give rise to an inference of causation, allegations that "each of the adverse actions . . . occurred against a backdrop of continuing antagonism" may nonetheless "establish a drumbeat of retaliatory animus from which a plausible inference of causation can be drawn." Duplan, 888 F.3d at 626; see also Martinez v. Conn. Dep't of Corr., 125 F. Supp. 3d 397, 424 (D. Conn. 2015) ("Given that the plaintiff is alleging a string of retaliatory incidents . . . it would not be unreasonable for a fact-finder to view the later incidents as temporally related to the CHRO complaint, even though the timing of any single one of the later incidents, viewed in isolation, might not reasonably permit an inference of causation.").

The defendants maintain that the causation requirement has not been satisfied. See Defs.' Reply Mem. in Supp. of their Mot. to Dismiss at 7-8 ("The October 2020 protected activity is not 'very close' to the alleged retaliatory actions in 2021 [since] Plaintiff's first alleged retaliatory act is more than five months later . . . ."). However, interpreting the plaintiff's pleadings to raise the strongest arguments they suggest, the plaintiff has alleged that the adverse actions, culminating in the constructive discharge, occurred against a backdrop of continuing antagonism. See Definitive Statement at 6 (Following the failed mediation for the first CHRO complaint, "Defendant .

. . launched a campaign of retaliation against Plaintiff" and at first "attempted to get Plaintiff fired" but when that was unsuccessful, "shifted his efforts to forcing Plaintiff to resign . . . implement[ing] a long and lamentable string of hostile retaliatory acts.").

The plaintiff states that within a month after he filed the first CHRO complaint, his CPE studies were ruled to be an unapproved DOC program, and two months after that, defendant Williams limited Passover services to individual worship and silent prayer instead of collective services, thereby eliminating the plaintiff's role in those services. Shortly thereafter, between March and May, the plaintiff was permanently transferred to CCI, lost the use of his state vehicle, and was denied the standard reimbursement for using his personal vehicle. In July, the plaintiff's proposed program "Gates of Understanding" was blocked. In August, the plaintiff was not allowed to discuss the incident involving the rumor of his death with his supervisor unless he agreed not to file an incident report; in addition he was denied an alternative work schedule, and he was warned several times regarding the contents of his emails. In October, the plaintiff's request to work from home to accommodate the final portion of his CPE studies was denied, and in November defendant Williams limited the observance of Hanukah to individual worship and silent prayer while permitting other

denominations to have normal collective services, thereby eliminating the plaintiff's role. The plaintiff also states that only a little over two months after he filed his second CHRO complaint in February 2022, he was constructively discharged. In addition, at unspecified points during the course of this series of events, the plaintiff was prohibited from sharing his spiritual writings and blamed for an inmate's suicide attempt. This alleged pattern of retaliatory actions "establish[s] a drumbeat of retaliatory animus from which a plausible inference of causation can be drawn." Duplan, 888 F.3d at 626 (finding but-for causation despite the fact that the alleged adverse actions occurred over two years after the protected activity because the plaintiff alleged a pattern of antagonism during the intervening period); see also Bosse v. Conn., 2021 U.S. Dist. LEXIS 250176, *27-29 (D. Conn. Aug. 3, 2021) (finding that the plaintiff's allegations of retaliatory conduct by the defendant, commencing within a month of her first protected activity and continuing until termination of her employment approximately nineteen months later, "establish a pattern of antagonism" sufficient to find causation despite the fifteen month gap between the plaintiff's last protected activity and the termination).

Based on the foregoing, the plaintiff has plausibly alleged causation as to the alleged adverse actions in the chain of

events that culminated in the constructive discharge. Therefore, the motion to dismiss is being denied as to Count Three with respect to defendant DOC.

**IV. CONCLUSION**

For the reasons set forth above, the defendants' Motion to Dismiss (ECF No. 24) is hereby GRANTED in part and DENIED in part. Counts Two, Four, Five, Six and Seven are dismissed, and all claims against the individual defendants are also dismissed. The case will proceed against defendant DOC, the only remaining defendant, on the claims in Count One and Count Three.

It is so ordered.

Dated this 18th day of January 2024, at Hartford, Connecticut.

/s/
_____
Alvin W. Thompson
United States District Judge
